IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 8, 2002 Session

## JWT, L.P. v. PRINTERS PRESS, INCORPORATED, ET AL.

**A Direct Appeal from the Chancery Court for Davidson County**
**No. 98-1994-III      The Honorable Ellen Hobbs Lyle, Chancellor**

_____

### No. M2001-02590-COA-R3-CV - Filed October 24, 2002

_____

Corporation sought compensatory and punitive damages for losses sustained as a result of neighboring business property owner's erection of a fence across a valid easement immediately adjacent to appellant's business. The chancery court denied corporation's claim for compensatory and punitive damages, but granted injunctive relief. Corporation appeals. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Michael K. Radford, Brentwood, For Appellant, Printers Press, Incorporated, and Britain's, Inc.

David S. Zinn, Brentwood, For Appellees, JWT, L.P., Hillsboro Plaza Enterprises, Hillsboro Plaza Associates, W. R. Weakley and Robert L. Trentham

Joel M. Leeman, Nashville, For Appellees, Beckerland, Frank H. Becker, Donna L. Nagelson and Becker Trust

**OPINION**

This case is before the court on a second appeal. In *JWT, L.P. v. Printers Press Inc., and Britain's Inc.*, No. 01A01-9904-CH-00209, 1999 WL 704733, at *1 (Tenn. Ct. App. Sept. 13, 1999), the Court determined that Printers Press, Incorporated ("Printers Press")[1] and Britain's, Inc.

---

[1] Printers Press filed a notice of voluntary non-suit of both its counter complaint and third party complaint on May 21, 2001. Hereinafter, any reference to appellant actions taken or arising after May 21, 2001, will pertain only to Britain's.

("Britain's"), held a valid easement across an adjoining lot owned by appellee JWT, L.P. ("JWT").[2] The court reversed the trial court's grant of summary judgment in favor of JWT and remanded the case with directions to the trial court to enter a judgment declaring that the easement was binding on the parties, and further directed the trial court to determine the issues of injunctive relief and damages. *Id*.

Britain's is the record owner of Lot 4, a tract of land located at 2034 Richard Jones Road in the Green Hills area of Nashville, Tennessee. Britain's first acquired an interest in this property on February 26, 1993, through a contract of purchase with Printers Press.[3] Britain's paid $108,635.06 for the property. Printers Press obtained the Lot 4 property by virtue of a deed conveyed to it by Thomas Becker, Frank Becker, and Donna Becker Holland on February 8, 1972. In 2001, Britain's sold the property to Grei Hinsen and Company for $450,000.00.

JWT's property, the Hillsboro Plaza Shopping Center, is located at 2010 Richard Jones Road and adjoins Britain's lot. At the time of JWT's purchase, and all times since, this property was designated as the servient estate for a forty-foot easement that runs along the eastern border of Lot 4.[4] This easement was recorded for the purpose of providing ingress and egress for Lot 4 across the parcel of land that is now identified as 2010 Richard Jones Road.

The conflict at issue in this case stems from an incident that occurred in 1992, while Printers Press was still the legal owner of Lot 4. The owner of Printers Press hired workers to repair the outside of its building. During the course of repairs, one of the workers placed construction materials in the easement, obstructing use of the easement for an entire day. W.R. Weakley, a general partner of JWT, HPE, and HPA respectively, requested the removal of these materials, but the worker refused. Weakley discussed the problem with Robert Trentham, the other general partner,

---

[2] Appellee JWT is a limited partnership formed by appellees W.R. Weakley ("Weakley") and Robert L. Trentham ("Trentham"). Weakley and Trentham serve as General Partners of JWT. JWT acquired title to property identified as 2010 Richard Jones Road in Nashville, Tennessee, on April 15, 1998, and is the record owner of the real property on which Hillsboro Plaza Shopping Center is located. Weakley and Trentham orchestrated the purchase of this property by warranty deed of record granted by Beckerland, a general partnership composed of three partners, Frank Becker, Donna Nagelson, and Becker Trust.

Appellee Hillsboro Plaza Enterprises ("HPE") is a general partnership. HPE is the record owner of a ground lease encumbering the property at 2010 Richard Jones Road. Appellee Hillsboro Plaza Associates ("HPA") is a general partnership. HPA is the owner and holder of a ground lease "encumbering the servient estate pursuant to an unrecorded Agreement of Sale dated February 1, 1982, and an unrecorded Assignment by and between Hillsboro Plaza Enterprises and Hillsboro Plaza Associates." Prior to April 15, 1998, either HPE or HPA or both were in possession and control of the encumbered property. After this date, either HPE, HPA, or JWT, or all were in possession and control of the property. Weakley and Trentham serve as General Partners for HPE, HPA, and JWT respectively.

[3] Britain's entered into a contract to purchase Lot 4 from Printers Press on February 26, 1993, but did not acquire legal title to the property until October 1, 1999.

[4] This easement was created in a 1967 lease agreement between Frank Becker and his wife Louise Becker, and Farmer's Daughter of Tennessee Inc.

and the men, acting on behalf of HPA, erected a chain link fence along the westerly edge of the easement and bordering the eastern boundary of Lot 4 to prevent further obstruction.

Britain's was formed in 1993 by Paul Parker ("Parker") and his wife with the intention that the store would specialize in the retail of antiques, reproductions, and accessories. Parker was aware of the fence when he purchased Lot 4 from Printers Press. Shortly after purchasing the property, Parker submitted an application to the Metropolitan Department of Codes Administration ("Codes") for permission to use the building located on Lot 4 for the "wholesale sales of furniture, accessories and related items." Parker testified that he never applied for a permit to use the Lot 4 building for the retail sale of antiques as originally intended. However, Parker contends that he neglected to file an application because Codes had already told him that he could not have a retail business on the property with the fence in place.

Appellees offered evidence in the form of testimony from Metropolitan Zoning Administrator, Lon F. West ("West") to rebut Parker's argument that Codes declared the building unfit for retail use. West denied ever telling Parker that his building could not be used for retail, and further testified that Parker, pursuant to the original use permit issued in 1972, could have used the entire first floor of the two-story building for his retail sales business.[5]

Conflicting evidence was presented during the trial regarding the physical condition of Britain's building. The parties dispute whether Britain's maintained the property in a rentable condition, and, if not, whether the proximity of the fence to Britain's property prevented proper maintenance. Appellees assert that Britain's "enhanced" its damages by failing to maintain the property in rentable condition. They cite two documents in support of this argument. The first document is a letter dated September 13, 1996, from R.A. Willoughby, a building inspector for Codes, to Printers Press. Willoughby sent this letter after inspecting the Lot 4 building. The letter warned Printers Press that the building was a "public nuisance" and health hazard that must either be repaired or demolished. The second document introduced by appellees was a letter from the Department of Water and Sewage Services to Printers Press. In this letter, the department notified Printers Press that the building contained a defective backflow prevention device. Printers Press was given one month to put the device in good operating condition and notify the department for inspection. There is no evidence on the record to indicate that Printers Press or Britain's complied with this demand or notified the department of repairs.

Dating from his purchase of Lot 4 in February of 1993, until the sale of the property to Grei Hinsen and Company on June 1, 2001, Parker did not operate a retail or wholesale business on the

---

[5] In a letter to members of the Metropolitan Board of Zoning Appeals of Nashville and Davidson County dated November 14, 2000, West stated that the original 1972 permit for the building provided that the entire two-story building could be utilized for retail sales. West noted, however, that the second floor of the building must now remain vacant due to the development of more restrictive parking requirements and the inadequacy of the parking available to the building.

property at any time.[6]  Parker testified that the presence of the fence obstructed the building, preventing him from operating his business or making necessary repairs to the exterior of the building.  According to Parker, the obstruction caused by the fence detracted from the value of his property and deterred prospective renters from entering into serious lease negotiations with Parker for use of the building.

As noted, the record established that Parker was aware of the fence prior to his purchase of Lot 4.  On two separate occasions, Parker hired legal counsel to draft letters demanding the removal of the fence.  The first letter, drafted by attorney Barry Gardner ("Gardner") and dated June 7, 1993, was addressed to Weakley.  In this letter, Parker threatened legal action if the fence was not removed within ten days of receipt of the demand.  The second letter dated June 1, 1994, was sent to Trentham by attorney Robert J. Notestine III ("Notestine").  This letter also promised legal action if the fence was not immediately removed.  Despite these letters, and appellant's subsequent failure to remove the fence as requested, Parker failed to pursue legal relief as promised.  Parker eventually filed a counterclaim to have the fence removed in 1998, but only after appellees filed an action to have the easement declared void.

The record indicates that Parker received several inquiries regarding the availability of the Lot 4 property.   Soon after Parker purchased the property in 1993, Chip Christianson ("Christianson") of CRC Holdings, Inc., contacted Parker about renting the property.  According to Parker's cross examination testimony, he and Christianson tentatively reached an agreement in principle. Despite the tentative agreement, the parties never finalized a deal.  Appellants and appellees disagree as to whether the failure of this agreement stemmed from Christianson's inability to reach an agreement with Weakley and Trentham for parking and removal of the fence.

In October of 1995, Weakley received a proposal from Ed Fryer ("Fryer") to lease the Lot 4 building in a joint arrangement with Weakley and Britain's.  Under this proposal, the building was to be leased by Britain's to Weakley, with Weakley subsequently subleasing the building and parking privileges to Fryer.  Weakley forwarded the proposal to Britain's, but Britain's did not pursue the inquiry further.  In 1996, a representative from Einstein Brothers Bagels ("Einstein")  submitted a proposal to purchase the Lot 4 property from Britain's.  Although Parker testified that a sale to Einstein was impliedly contingent upon the removal of the fence, the Einstein proposal did not explicitly require such a contingency.  Ultimately, Britain's rejected Einstein's proposal for a lack of interest.  Over the years, Britain's also received multiple inquiries and preliminary offers from Weakley regarding the sale or rental of Lot 4, all of which he rejected.

In July of 1998, JWT brought an action in chancery court seeking a declaration that Britain's easement across the 2010 Richard Jones Road property was void.  Appellants answered and asserted a counterclaim for a declaratory judgment proclaiming the easement valid.  Appellants also sought

---

[6] Parker testified that he could not use the building for wholesale furniture sales because it was too difficult for delivery drivers to maneuver their 40-foot trucks to reach the building, regardless of the presence and availability of the easement.

damages and injunctive relief. The court, in an opinion styled ***JWT, L.P. v. Printers Press Inc., and Britain's Inc.***, No. 01A01-9904-CH-00209, 1999 WL 704733, at *1 (Tenn. Ct. App. Sept. 13, 1999), held that JWT was estopped to deny the existence of the easement. The court reversed the trial judge's grant of summary judgment in favor of JWT and remanded for "entry of a judgment declaring the easement binding on the parties, and trial on the issues of injunctive relief and damages." *Id*. at 2.

Printers Press and Britain's filed multiple motions to amend their counter complaint and third party complaints, naming Hillsboro Plaza Enterprises, Hillsboro Plaza Associates, Weakley, and Trentham as additional parties upon discerning the involvement of each. The motions acknowledged that appellees removed the fence on October 22, 1999 following the chancery court's declaratory judgment, but further prayed for declaratory relief affirming that appellants were entitled to use the easement for parking purposes. In the alternative, appellants prayed for injunctive relief prohibiting appellees from "parking upon or otherwise obstructing the westerly 20 feet of the easement at issue...."[7] Appellants asserted that the fence was an obstruction that prevented them "from obtaining an occupancy permit for the subject property, unlawfully interfered with [their] use of the subject property, [and] adversely impacted the value of the subject property...." In addition to compensatory damages, appellants sought recovery of punitive damages on the basis that appellees' erection of the fence constituted "intentional misconduct, or misconduct in reckless disregard of [appellants'] interest in said property." The chancery court granted all motions to amend.

Appellees filed a joint answer to appellants' amended complaints, asserting that the counter and third party complaints filed by appellants were barred by the three year statute of limitations governing property damage, the equitable doctrine of laches, and the doctrine of adverse possession. Appellees further averred that the doctrines of waiver and estoppel acted as complete bars to recovery. In response to appellants' motion to amend of July 9, 2001, appellees filed a second joint answer asserting the additional affirmative defense of failure to mitigate damages.

On May 21, 2001, Printers Press filed a notice of voluntary non-suit of both its counter complaint and third party complaint. Upon receipt of this notice, the court ordered all pending claims of Printers Press for damages or injunctive relief dismissed without prejudice.

The injunctive relief and damages issues raised by appellants and the affirmative defenses asserted by appellees were tried to the chancery court in August of 2001. On September 13, 2001, the court entered an order holding that appellants were not entitled to compensatory or punitive

---

[7] JWT filed a third party complaint against Beckerland, Frank Becker, Donna Nagelson, and Becker Trust ("Beckerland"), denying that the deed granted by Beckerland to appellants included parking rights on the easement. JWT's action alleged breach of warranty of title by Beckerland in the event the chancery court determined that appellants were entitled to parking rights pursuant to the deed granting the easement.

HPE, HPA, Weakley, and Trentham filed a third party complaint against Beckerland alleging that Beckerland would be obligated to indemnify appellees for any liability assigned to them as a result of the construction of the fence. In the alternative, appellees asserted that Beckerland would be liable for breach of the lease between Beckerland and appellees as a result of the easement that it granted to appellants.

damages as Britain's failed to "act reasonably or diligently in mitigating its damages." The court did, however, determine that "[d]iscretionary costs shall be awarded to Britain's upon it filing a post-judgment motion detailing those costs." Addressing the affirmative defenses raised by appellees, the court rejected the statute of limitations and laches defenses on the basis that the fence constituted a temporary, rather than permanent, nuisance. Finally, noting that the fence had been removed, the court issued a permanent injunction prohibiting appellees and their successors from obstructing the easement.

In a side note, the court held that appellees had no basis for an indemnity claim against the Beckerland. This decision was not appealed.

Britain's immediately complied with the court's order to file a post-judgment motion detailing discretionary costs. Appellees, in response to the September 13 order, filed a motion to alter or amend the judgment, specifically challenging the award of discretionary costs. After consideration of the motions and responses filed by the parties, the court modified its order of September 13 to delete the award of discretionary costs to Britain's.

Britain's has appealed the judgment of the chancery court, presenting the following four issues for review: (1) Whether the court erred in ruling that failure to mitigate damages is a complete bar to recovery; (2) Whether the court erred in finding that Britain's failed to mitigate damages; (3) Whether the court erred in dismissing Britain's claim for punitive damages; and (4) Whether the trial court erred when it amended its order to deny Britain's discretionary costs, thereby denying Britain's motion for discretionary costs. Appellees offer two additional issues for review which we quote from their brief:

> (1) Were Britain's claims barred by the three-year property statute of limitations?
> (2) Were Britain's claims barred by laches?

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d).

The first two issues presented by appellants for review can be combined into a single question stated as follows: Whether, under the facts of this case, the trial court erred in finding that Britain's failed to mitigate its damages and subsequently barring appellants from recovery of compensatory damages.

Under the doctrine of mitigation of damages, an injured party is enlisted with a duty to exercise reasonable care and due diligence to avoid loss or minimize damages after suffering injury. *Kline v. Benefiel*, No. W1999-00918-COA-R3-CV, 2001 WL 25750, at *7 (Tenn. Ct. App. Jan. 9, 2001) (citing *Cook & Nichols, Inc. v. Peat, Marwick, Mitchell & Co.*, 480 S.W.2d 542, 545 (Tenn. Ct. App. 1971); *Gilson v. Gillia*, 321 S.W.2d 855, 865 (Tenn. Ct. App. 1958)).

> Generally, one who is injured by the wrongful or negligent act of another, whether by tort or breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage, and to the extent that his damages are the result of his active and unreasonable enhancement thereof, or due to his failure to exercise such care and diligence, he cannot recover.

*Cook & Nichols, Inc.*, 480 S.W.2d at 545.

In determining whether an injured party has fulfilled its duty to mitigate, a court must examine "whether the method which he employed to avoid consequential injury was reasonable under the circumstances existing at the time." *Action Ads, Inc. v. William B. Tanner Co., Inc.*, 592 S.W.2d 572, 575 (Tenn. Ct. App. 1979) (quoting *Tampa Electric Co. v. Nashville Coal Co.*, 214 F. Supp. 647, 652 (M.D. Tenn. 1963)). Despite this duty, an injured party is not required to mitigate damages where such a duty would constitute an undue burden. *Kline*, 2001 WL 25750, at *7 (citing *Cummins v. Brodie*, 667 S.W.2d 759, 766 (Tenn. Ct. App. 1983)).

Considering the circumstances of this case as they existed from 1992 through October of 1999, the period during which the fence stood erect, we find that Britain's failed to exercise reasonable care or diligence to mitigate its damages. Britain's claim for compensatory damages alleges a loss of rental profits as a result of the presence of the fence. Specifically, Britain's asserts that the fence discouraged potential lessors or buyers from inquiring about the availability of the Lot 4 property, and further prevented Britain's from use and operation of the building as a retail or wholesale establishment because it could not obtain use approval from the fire marshal or Metro Traffic and Parking. We find these arguments unpersuasive and thereby affirm the finding of the trial court for the following reasons.

Examining the record and testimony presented at trial, we are convinced that HPA's construction and maintenance of the "obstructing" fence did not discourage potential lessors or buyers from inquiring about Britain's property. By Britain's admission, it received at least three serious inquiries or offers regarding lease or purchase of the Lot 4 property. Parker confirmed that, as the owner of Britain's, he received offers from Christianson, Einstein, Fryer, and numerous proposals from Weakley, until finally settling on an offer from Grei Hinsen and Company in 2001. While Britain's was certainly entitled to accept or reject any and all of these proposals, the fact that it received at least three serious inquiries or offers regarding the property refutes Britain's argument that the fence discouraged inquiries from prospective tenants or buyers. It is our conclusion that Britain's cannot be allowed to recover lost rental profits where it failed to diligently pursue legitimate, unsolicited offers.

The evidence further indicates that Britain's made no efforts to actively advertise the availability of the Lot 4 property. In fact, Britain's was unable to produce any evidence of communications with real estate brokers regarding the property prior to Britain's 1999 negotiations with Grei Hinsen and Company.

Britain's was originally chartered to operate as a retail business selling fine antiques, reproductions, and accessories. However, despite the initial business plan, Britain's did not file an application for a retail permit until 2000, the necessary and first step to achieving use and occupancy approval for a retail business. Britain's argues that an officer at Codes told him that the building could not be used for retail because of inadequate parking, and therefore did not take the futile steps of filing for a permit. Testimony from West, the Metropolitan Zoning Administrator, was offered to rebut this claim. West testified that he never told Parker that he could not get a retail permit for the property as long as the fence was in place. Further, West noted that the first-floor of Britain's building could have been used for retail because in 1993, approval from Traffic and Parking would not have been necessary for the issuance of a retail permit as use of the entire first floor as retail space was a "grandfathered nonconformity."

Despite its original intention to operate as a retail antique store, Britain's filed a wholesale use permit a mere sixteen days after it acquired a contractual interest in the Lot 4 property. This wholesale application required Britain's to secure the approval of the Department of Water and Sewage Services and Metropolitan Traffic and Parking before issuance of a permit. During his cross examination, Parker admitted that he failed to receive approval of these agencies as required.

Approval of the Metro fire marshal was also required by Codes as a condition precedent to permit issuance. Assistant Fire Marshal Michael Dutton ("Dutton") testified that his office was responsible for reviewing and evaluating drawings or blueprints typically submitted by individuals seeking use and occupancy permits for the use of commercial property in the Metro area. Dutton testified that, to his knowledge, Britain's had not submitted such plans for approval. Without these plans, the fire marshal's office could not conclusively determine whether Britain's proposed use and layout for the building complied with Metro's life safety code.

Britain's argues that the location of the fence immediately adjacent to its building prevented rear exit from the building in violation of the life safety code. Due to this obstruction, Britain's asserts that it was prevented from obtaining a use and occupancy permit. Dutton testified that compliance with the code would hinge on the floor-plan implemented by Britain's. The building at issue is approximately 68 feet in length. The life safety code requires at least one exit to be located within a travel-distance of less than 75 feet from any point in the room. Therefore, it is possible that even with the fence in place, Britain's may have been in compliance with the code and therefore eligible for a use and occupancy permit.

Without regard to Britain's failure to obtain the above noted approval, Parker testified that it would have been impossible to operate a wholesale business on the Lot 4 property because the forty-foot trailers required to deliver wholesale furniture to Britain's could not access the building, even with use of the easement. Based on this evidence, the only possible use for the Lot 4 property, as Britain's intended, was for retail. As the facts demonstrate, Britain's failed to take the necessary steps to establish a retail operation on the Lot 4 property regardless of the alleged interference caused by appellees' actions.

The parties strongly dispute the physical condition of Britain's building during the time period at issue. Britain's contends that it spent nearly $80,000.00 to renovate the inside of the building, and on numerous occasions were rebuffed in their attempt to make necessary repairs to the building's exterior. Appellees argue that the building was maintained in an unrentable state of repair as evidenced by a 1996 letter from Codes that declared the building "a public nuisance and a hazard," and ordered Britain's to either repair or demolish the building. The trial court agreed with appellees' argument, citing the deteriorated condition of the building as a determining factor in her decision to deny Britain's compensatory damages for failure to mitigate.

Our finding that Britain's failed to mitigate its damages is further supported by Britain's decision to delay legal action demanding immediate removal of the fence. If the loss suffered by Britain's as a result of the presence of the fence precluded any or all legal or entitled use of the property, we find it difficult to understand why Britain's failed to institute legal action prior to 1998. Britain's pleads that "[a]ppellees stole Britain's easement rights and held them for ransom," yet Britain's never called upon court authority to aid in release. Despite obvious awareness of its legal rights, as evidenced by the letters drafted by attorneys Gardner and Notestine on Britain's behalf, Britain's waited approximately five years before taking action. Moreover, when appellee's refused to comply with Britain's sensible demand, Britain's neglected to take the promised steps to protect its property interests, thereby rendering legal action nothing more than a hollow threat. When Britain's finally brought suit demanding removal of the fence, it was only in response to appellees' initial claim for a judgment declaring the easement void.

Based on the evidence presented, we find that Britain's failed to mitigate damages as it neglected to exercise reasonable care and due diligence. By failing to take the necessary steps to procure a retail permit, maintaining the property in an unrentable condition, and disregarding or refusing numerous lease inquiries and proposals, Britain's voluntarily allowed the Lot 4 property to sit vacant for nearly eight years. For these reasons, we find that the evidence in the record does not preponderate against the findings of the trial court. We therefore affirm the trial court's denial of compensatory damages.

While we agree with Britain's assertion that failure to mitigate damages is not a complete bar to recovery, *see Salley v. Pickney Co.*, 852 S.W.2d 240, 244 (Tenn. Ct. App. 1992), Britain's failed to present credible proof of damages incurred regardless of failure to mitigate.

Britain's next presents for review the issue of whether the trial court erred in dismissing their claim for punitive damages. Britain's sought punitive damages on the theory that appellees' obstruction of the easement constituted intentional misconduct, or, at the very least, demonstrated a reckless and conscious disregard for appellant's property rights.

It is settled law in Tennessee that punitive damages cannot be sustained absent an award of actual damages. *Liberty Mut. Ins. Co. v. Stevenson*, 212 Tenn. 178, 368 S.W.2d 760 (1963) (citing *Allen v. Melton*, 20 Tenn. App. 387, 99 S.W.2d 219 (Tenn. Ct. App. 1936)); *see Emerson v. Garner*, 732 S.W.2d 613, 614-15 (Tenn. Ct. App. 1987). However, "[w]here the plaintiff has proved

an entitlement to injunctive relief, an award of punitive damages may be upheld without an award of compensatory damages." ***Oakley v. Simmons***, 799 S.W.2d 669, 672 (Tenn. Ct. App. 1990). In her order of September 13, 2001, Chancellor Ellen Hobbs Lyle issued a decree "permanently enjoining the third-party defendants and those who succeed to their property rights from obstructing the easement." Taking into consideration the law set forth in ***Oakley*** and Chancellor Lyle's order of September 13, our finding that Britain's is not entitled to an award for compensatory damages would therefore not preclude an analysis of whether the chancery court abused its discretion in denying appellants' claim for punitive damages.

To recover punitive damages, a plaintiff must prove, by clear and convincing evidence, that the defendant engaged in intentional, fraudulent, malicious, or reckless conduct. ***Hodges v. S.C. Toof & Co.***, 833 S.W.2d 896, 901 (Tenn. 1992). The Supreme Court has defined the clear and convincing evidence standard to mean "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***Id***. at 901 n.3. The determination of whether punitive damages should be awarded "is a matter largely within the discretion of the trial court, and will not be disturbed on appeal except in case of abuse of the discretion." ***See Lichter v. Fulcher***, 22 Tenn. App. 670, 125 S.W.2d 501, 506 (Tenn. Ct. App. 1938) ("Where the case is tried before the Chancellor it is obvious that it is peculiarly within the discretion of the Chancellor as to how much, if any, punitive damages should be allowed.").

As stated, Britain's argued, both at trial and in its brief to this court, that appellee's construction of the fence constituted intentional, or, at the very least, reckless conduct sufficient to support an award for punitive damages. The chancellor rejected this argument in granting appellees' motion to dismiss the punitive damages claim, concluding that "Britain's failed to demonstrate by clear and convincing evidence that JWT's actions were motivated by ill-will, wrongful intent, malice, or reckless disregard." Despite this ruling, Britain's contends that the chancellor's September 13 order does not address its theories of intentional or reckless misconduct, but rather states that punitive damages were denied because the "fence was not erected out of malice or ill will."

Regardless of the language relied upon by the chancellor in her order, we find that her denial of Britain's punitive damages claim does not constitute an abuse of discretion as Britain's failed to prove, by clear and convincing evidence, that appellees engaged in intentional or reckless misconduct. The precise definitions for intentional and reckless conduct were set forth by the Supreme Court in ***Hodges v. S.C. Toof & Co.***:

> A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. ***Cf***. T.C.A. § 39-11-302(a) (1991) (criminal definition of "intentional").... A person acts recklessly when the person is aware of but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that

an ordinary person would exercise under all the circumstances. *Cf*.
T.C.A. § 39-11-302(c) (1991) (criminal definition of "reckless").

833 S.W.2d 896, 901 (Tenn. Ct. App. 1992)(citations omitted).

The parties do not dispute, and we find no evidence to the contrary, that it was the conscious objective of appellees to erect the fence along the eastern boundary of Britain's Lot 4 property. However, the issue is not whether appellees intentionally or consciously constructed the fence adjacent to Lot 4, but rather the motive for the erection of the fence. Britain's asserts that appellees, despite having knowledge of Britain's legal right to use the easement, constructed the fence to restrict access to the easement until Britain's agreed to pay for parking privileges on Hillsboro Plaza. According to Britain's, Weakley and Trentham were put on notice of Britain's easement rights by Gardner's letter of June 7, 1993, and again by Notestine's letter dated June 1, 1994. Any lack of knowledge, Britain's alleges, was due to Weakley and Trentham's unreasonable and "reckless" failure to conduct a title search on the Lot 4 property.

Considering all of the proof presented in the record, we find that Britain's has not proven, by clear and convincing evidence, appellees' erection of the obstructing fence constituted intentional or reckless conduct. The fence was erected in 1992, approximately one year prior to Britain's purchase of the Lot 4 property. We are further persuaded by the evidence in the record that appellees' erected the fence to prevent the construction worker, hired by Printers Press to replace windows on the Lot 4 building, from continuing to obstruct the easement. Although we do not necessarily condone appellee's decision as the most accommodating solution, we do not find that appellees acted intentionally and recklessly to injure Britain.

We specifically note Trentham's testimony as evidence that appellees' actions did not amount to a gross deviation from the accepted standard of care owed by an individual or corporation similarly situated. As an attorney with prior real estate and title search experience, Trentham was sufficiently qualified to evaluate and interpret the terms of the original easement agreement between Louise Becker and Jack Loiseau, dated June 19, 1972. The agreement provides:

> For and in consideration of the sum of Ten ($10.00) Dollars cash in hand paid, I, Louise N. Becker, a widow, grant unto John E. Loiseau, his heirs and assigns, an easement and right to use jointly with others for the purpose of ingress and egress a 40-foot easement adjacent to certain property leased by said John E. Loiseau from Thomas A. Becker, Frank H. Becker and Donna Becker Holland...
>
> ***************************************************
>
> That this easement shall continue only so long as the aforesaid lease agreement between Thomas A. Becker, Frank H. Becker and Donna Becker Holland and John E. Loiseau remains in full force and effect,

this easement to terminate automatically upon the termination of the said lease agreement.

According to Trentham's testimony, the above agreement was the only document available to him at the time he and Weakley decided to erect the fence. In Trentham's opinion, the lease agreement and easement terminated upon the assignee's filing for bankruptcy. On this basis, Trentham concluded that construction of the fence would not violate Printers Press's right to use the easement, as no such right existed.

We find that Trentham's reading and interpretation of the 1972 agreement was reasonable. As an attorney qualified to interpret terms of a deed, Trentham justly relied upon his knowledge and experience in concluding that no valid easement existed. Although his interpretation was later proven erroneous, we nonetheless find that it was reasonable under the circumstances. Therefore, because appellees did not recklessly deprive Britain's of a legal right to use the easement, we hold that Britain's is not entitled to punitive damages.

We quote Britain's final issue for review directly from its brief:

> Did the trial court err in amending its memorandum and order to deny Britain's discretionary costs and in denying Britain's motion for discretionary costs?

This court examined the standard of review for discretionary decisions of a trial judge in depth in **White v. Vanderbilt Univ.**, 21 S.W.3d 215, 222-223 (Tenn. Ct. App. 1999).

> Discretionary decisions require conscientious judgment. They must take the applicable law into account and must also be consistent with the facts before the court. Appellate courts will set aside a discretionary decision only when the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence. Thus, a trial court's discretionary decision should be reviewed to determine: (1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principles, and (3) whether the trial court's decision is within the range of acceptable alternatives. Appellate courts should permit a discretionary decision to stand if reasonable judicial minds can differ concerning its soundness.

*Id*. at 223 (internal citations omitted).

Stated more succinctly, the decision whether to award a party discretionary costs rests with the sound discretion of the trial court and will not be disturbed absent an abuse of discretion.[8] *Shahrdar v. Global Housing, Inc.*, 983 S.W.2d 230, 239 (Tenn. Ct. App. 1998) (citing Tenn. R. Civ. P. 54.04(2); *Lock v. National Union Fire Ins. Co.*, 809 S.W.2d 483 (Tenn. 1991)). Pursuant to Tennessee Rule of Civil Procedure 54.04, such discretionary costs "shall be allowed as of course to the prevailing party unless the court otherwise directs."

An abuse of discretion is committed when a trial court applies an incorrect legal standard or "reaches a clearly unreasonable decision" that injures an aggrieved party. *See Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citing *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). In her order of September 13, 2001, the judge awarded discretionary costs to Britain's contingent upon Britain's filing a post-judgment motion detailing these costs. Britain's immediately complied with the order. Appellees, in response to the September 13 order, filed a motion to alter or amend the judgment, specifically challenging the award of discretionary costs. After consideration of the motions and responses filed by the parties, the court modified its order of September 13 to delete the award of discretionary costs to Britain's. Deletion of the award was based on the court's conclusion that all of the discretionary costs which Britain's sought to recover were "incurred solely in connection with its unsuccessful claim for damages."

After examining the records submitted by Britain's regarding discretionary costs, we find that the trial court did not abuse its discretion in amending its order to deny Britain's recovery for these expenses. We conclude that the court's decision was supported by the evidence and well within the range of acceptable alternatives the court had to choose from. Britain's argues that it was the prevailing party in this suit because it was awarded injunctive relief. While we do not dispute that the trial court awarded Britain's injunctive relief, we do not consider Britain's the prevailing party with regard to this lawsuit. This case was remanded for consideration of the issues of injunctive relief and damages; however, the costs sought by Britain were incurred in connection with the claim for compensatory and punitive damages - an issue that was ultimately decided in favor of appellees. Because the issues of compensatory and punitive damages were predominantly considered and argued in this case, as evidenced by the briefs of the parties and the trial record, we hold that the trial court did not abuse its discretion in concluding that Britain's was not the prevailing party, and therefore not entitled to discretionary costs.

Appellees' first issue for review is whether Britain's claims were barred by the three-year statute of limitations for injuries to personal or real property. Section 28-3-105 of the Tennessee Code Annotated provides that an action for injury to real property "shall be commenced within (3) years from the accruing of the cause of action." T.C.A. § 28-3-105 (2000). Appellees assert that, regardless of whether the fence is classified as a nuisance or a trespass, an action for injunctive relief to abate the nuisance or trespass is barred if not brought within three years of the creation of the nuisance. *See Caldwell v. Knox Concrete Products, Inc.*, 391 S.W.2d 5, 11 (Tenn. Ct. App. 1964);

---

[8] "[A]ppellate courts are generally disinclined to interfere with a trial court's decision in assessing costs unless there is a clear abuse of discretion." *Perdue v. Green Branch Mining Co.*, 837 S.W.2d 56, 60 (Tenn. 1992).

*Alley v. Cleveland*, No. 03A01-9605-CV-00160, 1996 WL 605157, at *2 (Tenn. Ct. App. Oct. 23, 1996).

"A nuisance has been defined as anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable." *Caldwell*, 391 S.W.2d at 9 (citation omitted). Finding that the fence erected by appellees disturbed Britain's free use of the easement, and arguably the Lot 4 building, we agree with the trial court's classification of the fence as a nuisance.

Determination of the issue presented hinges on whether the fence constituted a permanent or temporary nuisance. A permanent nuisance is one that will 'continue indefinitely and is at once productive of all the damage that can ever occur from it.' *Shearon v. Tucker Corp.*, No. M2000-00624-COA-R3-CV, 2001 WL 1158897, at *4 (Tenn. Ct. App. Oct. 2, 2001) (quoting *Kearney v. Barrett*, No. 01A01-9407-CH00356, 1995 WL 1690, at *2 (Tenn. Ct. App. Jan. 4, 1995)). Where the plaintiff has a cause of action for damages based on a theory of permanent nuisance, the statute of limitations on such action begins to run "from the time of the complete creation of the nuisance. *Caldwell v. Knox Concrete Products, Inc.*, 391 S.W.2d 5, 11 (Tenn. Ct. App. 1964). The proper measure of these damages is the amount of depreciation in the market value of the injured realty. *Bennett v. Cumberland Hardwoods, Inc.*, No. 01-A-019111CH00419, 1992 WL 135808, at *5 (Tenn. Ct. App. June 19, 1992) (citing *Butcher v. Jefferson City Cabinet Co.*, 59 Tenn. App. 59, 67, 437 S.W.2d 256, 259 (1968)).

A temporary nuisance, in contrast, is one "that can be corrected by the expenditure of labor or money." *Caldwell*, 391 S.W.2d at 11 (citing *City of Nashville v. Comer*, 88 Tenn. 415, 12 S.W. 1027, 1030 (Tenn. 1890)). Damages caused by a temporary nuisance are recurrent, "and may be recovered from time to time until the nuisance is abated." *Caldwell*, 391 S.W.2d at 11 (citing *Louisville & N. Terminal Co. v. Lellyett*, 114 Tenn. 368, 403, 85 S.W. 881, 890 (Tenn. 1904)).

> It seems to us that the true rule deducible from the authorities is that the law will not presume the continuance of a wrong, nor allow a license to continue a wrong, when the cause of the injury is of such a nature as to be abatable either by the expenditure of labor or money. And that, where the cause of the injury is one not presumed to continue, that the damages recoverable from the wrong-doer are only such as have accrued before action brought, and that successive actions may be brought for the subsequent continuance of the wrong or nuisance.

*Comer*, 88 Tenn. 415, 12 S.W. at 1030.

From the case law cited above, it is obvious that the test for determining if a nuisance is temporary in nature is whether the nuisance can be corrected by the expenditure of labor or money. *See id.* Appellees assert that the fence constituted a permanent nuisance for the reason that it

-14-

presented permanent, rather than recurrent, injury to Britain's rights in the easement. They argue that the injury caused by the fence was "constant and unchanging," and therefore, by definition, could not produce recurring damage.

As indicated in the record, the fence was erected prior to, and in place at the time of, Britain's purchase of the Lot 4 property in 1993. Appellees assert that "Britain's took full possession of the premises in 1993 with knowledge of the fence and the obstruction it presented." Because Tennessee law ordinarily recognizes that a statute of limitations begins to run when a plaintiff is aware that they have a legally valid cause of action, appellees conclude that the three-year statute of limitations on Britain's claims accrued in 1993. Since Britain's counter complaint and third party complaint were not filed until 1998, appellees argue that these actions are subsequently barred by the statute of limitations.

In contrast, Britain's classifies the fence as a temporary nuisance. As support for its argument, Britain's notes that appellees were required to expend very little money or effort in removing the fence. Although the record does not specifically indicate how long the removal process took, it is clear from the evidence that appellees were not forced to dedicate a significant amount of time or energy to the removal effort. Britain's further notes that it cost appellees a mere $400.00 for complete removal of the fence. For these reasons, Britain's concludes that the fence was a temporary nuisance capable of correction by the expenditure of labor or money.

The trial court found favor in Britain's arguments, holding that Britain's claims were not barred by the statute of limitations as the fence constituted a temporary nuisance. Finding that the injury suffered to Britain's property was continuing, the court reasoned that because the fence could have been removed at any time, and, in fact was removed, it was not permanent in nature.

After reviewing the arguments of the parties and the relevant case law, we find that the fence constituted a temporary nuisance, and therefore affirm the trial court's holding that Britain's claims were not barred by the three-year statute of limitations governing personal and real property claims. We are persuaded by Britain's argument that the injury caused by the presence of the chain link fence was easily abated through minimal expenditure of labor and money. The facts in the record bear out this conclusion, as it is evident that appellees were able to erect and disassemble the fence essentially overnight and at only a slight cost. We note appellees' citation to *Kearney v. Barrett*, No. 01-A-01-9407-CH00356, 1995 WL 1690, at *2 (Tenn. Ct. App. Apr. 24, 1995), offered as support for their argument that the classification of a temporary nuisance as one that can be corrected by the expenditure of labor or money is not 'entirely satisfactory.' In *Kearney*, the court relied on a more "pragmatic" test for determining the nature of a nuisance, looking to whether "the harm resulted from reasonable and lawful operations on the defendant's property." *Id*. Because appellees' erection of the fence was ultimately deemed an "unlawful operation," we find the modified analysis adopted in *Kearney* inapplicable to the case at bar. Appellees have cited to no other case law that would persuade us to reevaluate the trial court's classification of the fence as a temporary nuisance.

Appellees' final issue for review is whether Britain's claims are barred by the equitable doctrine of laches. Appellees argue that Britain's five-year delay in filing suit against appellees for erection of the fence, despite immediate knowledge and recognition of their right to bring such an action, constituted a gross and unreasonable delay. We reject appellees' argument for the simple reason that they have failed to offer any evidence to prove that they have been prejudiced by the delay. *See Wilson v. Wilson*, 58 S.W.3d 718, 729 (Tenn. Ct. App. 2001). Without such proof, appellees are not entitled to the equitable defense of laches. We therefore affirm the trial court's holding that Britain's claims are not barred by laches.

In conclusion, we affirm the order of the trial court in all respects. Costs of the appeal are assessed to the appellant, Britain's, Inc., and its surety. The case is remanded for such further proceedings as may be necessary.

_____

W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.